# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

MICHAEL SANTOS,             :
    **Plaintiff,**           :
           :
**v.**                :      **CIVIL ACTION NO. 25-CV-6329**
           :
**OFFICER BERROA,** *et al.*,    :
    **Defendants.**       :

## MEMORANDUM

**PEREZ, J.**                                  **JANUARY 23, 2026**

      Plaintiff Michael Santos brings this civil action, primarily under 42 U.S.C. §1983, based on the conditions at the Berks County Jail ("BCJ"), where he is incarcerated as a pretrial detainee.  (Compl. (ECF No. 6) at 2-3, 6, 15.)   He seeks leave to proceed *in forma pauperis* (ECF Nos. 1, 2).  For the following reasons, the Court will grant Santos leave to proceed *in forma pauperis* and dismiss his claims with the exception of those related to the condition of the cell in which he served a ten-day disciplinary sentence.

## I.    FACTUAL ALLEGATIONS[1]

      The Complaint names the following Defendants:  (1) Warden Jeffrey Smith; (2) Deputy Warden Stephanie Smith; (3) Lt. Nemeth; (4) Sgt. Gorel; (5) Sgt. Levan; (6) Officer Berroa;[2] (7) Kevin J. Barnhardt; (8) Berks County Commissioners; (9) Christian Y. Leinbach; (10) Deputy

---

[1] The factual allegations in this Memorandum are taken from Santos's Complaint and attachments to the Complaint, which include copies of the Berks County Jail System Inmate Handbook, grievances and appeals Santos filed, and disciplinary actions taken against him. (ECF No. 6; ECF No. 6-1).  The Court adopts the pagination supplied to Santos's submissions by the CM/ECF docketing system.

[2] This Defendant's name is spelled "Boroa," "Berroa," and "Borea" in Santos's submissions. The Court will use Berroa for purposes of this Memorandum.

Warden Tassone; (11) Deputy Warden Roberts; (12) Lt. Johnson; (13) C.O. Wertz;[3] (14) C.O.

Drozdak; (15) C.O. Kissinger; (16) C.O. Cancel; (17) C.O. Ramirez; (18) C.O. Graff; (19) C.O.

Claudio; (20) L.T. Marshall; (21) C.O. Hartzel; (22) S.O.G. Officers (special operations group);

(23) Berks County Jail; (24) Berks County; (25) Berks County Jail Prison Board; (26)

PrimeCare, Inc; (27) PrimeCare Mental Health Department at BCJ; and (28) Sgt. Akers.[4]

(Compl. 3-5, 14.)  The gist of the Complaint is that Santos was repeatedly subject to verbal

harassment (some of a sexual nature) and retaliation, primarily in the form of discipline that led

to his placement in disciplinary confinement in a cell with inhumane conditions.  He claims to

have suffered "severe emotional distress, anxiety, and mental health anguish as a direct result" of

the harassment and retaliation he experienced at BCJ.  (*Id.* at 21.)

### A.  September 22, 2025 Misconduct

Santos alleges that the "first harassment incident" occurred on September 22, 2025, when

Officer Berroa yelled at him following an inspection on B Unit, where Santos was housed.  (*Id.*

at 15-16.)  That evening, Sgt. Gorel and Sgt. Levan found combs with missing teeth while

conducting a formal inspection of Santos's cell.  (*Id.* at 16.)  Santos explained that he used the

---

[3] This Defendant's name is spelled both as "Wertz" and "Werts" in Santos's submissions.  The Court will use Wertz for purposes of this Memorandum.

[4] Santos sued the individual Defendants in both their individual and official capacities.  (Compl. at 14.)  Suing an officer or employee in his official capacity is essentially a means of pleading claims against the entity of which the officer or employee is an agent.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  Since Santos's official capacity claims against the individual Defendants are therefore duplicative of his claims against those Defendants' employers, whom Santos also sued, the Court will dismiss them.  *See, e.g.*, *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) ("The district court correctly dismissed these defendants in their official capacity because the Staneks also sued the District."); *Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006) ("Because Cuvo is suing Palmer Township, the suit against the officers in their official capacities is redundant.").

combs to cut hair, and Gorel represented that he would discard the combs without issuing Santos a misconduct report.  (*Id.*)  Thereafter, Gorel and Levan met with Berroa to discuss the results of their inspection.[5]  (*Id.*)

After learning the results of the inspection, Berroa allegedly "became enraged—yelling profanities across the unit and accused inmates of making him look bad."  (*Id.*)  Berroa ordered Santos to his cell and, once there, "began threatening and verbally abusing [him] in Spanish stating 'Look dick sucker why would you tell the Sgt. you cut hair on the block?  You're a dick sniffer and for being a bitch you lost your tablet for 8 days.  You're lucky I didn't fuck you up for making me look stupid and you're never going to cut hair on my block again bitch!'"  (*Id.*)  Santos felt "shocked and fearful and emotional[ly] hurt," as well as "harassed and sexually degraded" by the "repeated use of homophobic and sexual insults."  (*Id.*)  He also claimed the incident triggered and "heightened" his preexisting mental health conditions.  (*Id.* at 16-17.)  When Berroa went on break, Santos "voluntarily" gave Officer Ramirez his tablet "for safekeeping," and to avoid further confrontation.  (*Id.* at 16.)

Santos alleges that the "second harassment incident" occurred less than an hour after the first incident, when Berroa returned from his break and Santos approached him to apologize.  (*Id.*)  At that time, Santos requested an alternative punishment so that he could use his tablet to communicate with his family and access legal research.  (*Id.* at 18.)  Berroa responded by "again saying 'You got me fucked up.  You fucked it up for everybody for being a bitch.  You shouldn't have made me look bad by telling the Sgt.  You're a barber on the block dick sucker.  Get out of my face."  (*Id.*)  Santos again felt embarrassed and "exposed, unsafe and mentally unstable."  (*Id.*

---

[5] The Court does not understand Santos to be bringing claims based on the inspection itself and, indeed, nothing suggests that Defendants Gorel and Levan did anything improper on this occasion.

at 19.)  He claims the "slurs made him appear as a target to other inmates heightening his fear for his personal safety."  (*Id.*)

Shortly thereafter, Santos made a second attempt to speak to Berroa, saying, "Earlier today you said you wanted to fight an inmate and wouldn't call for back up or press charges but you're writing me up for combs?"  (*Id.* at 19.)  Santos was referring to an incident that occurred on the block that afternoon, when Berroa "loudly stated" to inmates who were in the day room, "Oh this block is boring I'm waiting for one of you to say you want to fight me I'm not going to call backup or press charges."[6]  (*Id.* at 15.)  Santos contends he spoke this way to Berroa "out of fear and embarrassment and survival instincts, not as a threat because he genuinely believed he might be attacked."  (*Id.* at 18.)  Berroa responded, "You're a big mouth.  If you got a problem, we can go blow for blow like men."  (*Id.*)  Santos replied, "I'm waiting on you.  Your [sic] still sitting there.  I'll be in my cell 130 if you really like that."  (*Id.*)  He alleges that Berroa then "attempted to cover his actions by writing a false misconduct" accusing Santos of possessing altered combs and "creating a disturbance/threatening staff."  (*Id.*)  The misconduct stated "You will not verbalize that you will fight me.  Next time, it will be considered a threat Class 1 misconduct."  (*Id.*)  Documents attached to Santos's Complaint confirm that Berroa issued two "unit action notifications" to Santos on September 22, 2025—one for possession of the combs and one for a class II "disturbance" for verbalizing that he would fight Berroa—pursuant to which he imposed a total of eight days of lost tablet privileges.  (ECF No. 6-1 at 69-70.)

Santos alleges that the "write-ups were retaliatory and designed to justify [Berroa's] misconduct and to make [Santos] look like the aggressor."  (Compl. at 18.)  Following the

---

[6] Santos alleges that this type of statement was typical of Berroa's behavior and that no one responded to it.  (Compl. at 16.)

4

incident with Officer Berroa, Santos filed a grievance as well as a "PREA" that he submitted on September 25 or 26.  (*Id.* at 26, 44; ECF No. 6-1 at 95 (stating that Santos "contacted prea for the verbal sexual comments and names [Berroa] called [him] and the way [Berroa] made [him] feel").)  Defendant Lt. Nemeth responded to Santos's grievance by saying that the situation "will continue to be monitored," that "staff will be addressed and reminded of the expectation that both staff and inmates will remain respectful to one another in all interactions," and by informing Santos that "[b]ased on a separate situation that you and I spoke about [apparently the PREA allegation], the officer will not be assigned to B-unit" pending the outcome of Nemeth's investigation.  (ECF No. 6-1 at 61.)  Santos asked Defendants Lt. Nemeth and Sgt. Levan for "copies of the report and also the investigation into the PREA," but he has yet to receive them, (Compl. at 26), although he also acknowledges that at the time he drafted his Complaint the PREA investigation was still ongoing, (*id.* at 9).

Santos further alleges that he did not receive psychiatric treatment for the "trauma" and "the PREA he endured from said incident."  (Compl. at 26.)  In that regard, he notes that he "suffers from pre-existing mental health conditions, including trauma, anxiety, [and] PTSD, related to prior institutional abuse" and that Berroa's conduct caused him to experience emotional instability, "panic, flashbacks, sleeplessness, and worsening of [his] mental health." (*Id.* at 19.)  He further alleges that he had to increase the dose of his medications.  (*Id.* at 17.)

### B.  October 25, 2025 Misconduct

Santos next describes an incident with Correctional Officer Wertz that took place on October 25, 2025.  (*Id.* at 23.)  On that date, Wertz announced that he would begin confiscating tablets at 9:00 p.m., even though the standard practice was to collect the tablets at 9:30 p.m.  (*Id.*) While inmates were returning their tablets, Wertz was allegedly "laughing and smirking and

making the environment hostile with his [unspecified] comments and behavior." (*Id*.) Wertz also said he would be "doing cell searches, pat downs, and inspections at his sole discretion anytime he worke[d] the block." (*Id.*) Santos alleges that he and other inmates "understood this conduct to be retaliation against inmates for filing grievances against Wertz for his negative behavior towards inmates." (*Id.*)

When Santos and other inmates on the unit asked to discuss this incident with a sergeant, Wertz "got hostile," "said he would not be calling anybody" and threatened to "send everyone to the hole and to lock it the fuck in." (*Id.*) Wertz and Correctional Officer Cancel then wrote a misconduct charging Santos with saying "there are 60 of us and 1 of you.'" (*Id.*; ECF No. 6-1 at 81.) Santos believes he was "accused of being the alleged 'ringleader'" because he had "past grievance issues with Wertz." (Compl. at 23.)

Sergeants Gorel, non-defendant Vida, and two S.O.G. Officers interrogated Santos the next day and gave him the option to plead guilty to the charges for a "15 day informal with work privileges" or to plead not guilty and "lose b-block status, lose job, tablet, and other privileges on b-unit and go to the hole to fight the charges in a disciplinary hearing." (*Id.*; *see also* ECF No. 6-1 at 46 (describing "informal adjustments"); *id.* at 81-82 (reflecting that the misconduct was informally adjusted and that Santos waived his right to a hearing).) Santos chose to plead guilty to receive the lesser penalty, which was imposed by Sgt. Gorel. (Compl. at 24.) Consistent with the term of his discipline, he was limited to one ten minute "video visit" per week and otherwise restricted from tablet access. (ECF No. 6-1 at 82.)

### C.  October 30, 2025 Demotion

Santos claims that he was retaliated against on October 30, 2025, when he reported to the kitchen for work and Correctional Officer Hartzel "immediately started insulting" him by saying

"I don't know how the fuck you still have a job after threatening one of my co-workers.  Officers are not to be threatened."  (*Id.*)  Santos alleges that he "tried to explain his side of the story" but that Hartzel did not want to listen and fired him because of the incident with Wertz.  (*Id.*)  When Santos explained that the terms of his informal disciplinary sanction still permitted him to work at his kitchen job, Hartzel stated "I don't know who you blew to get that but this is unheard of and I'll be talking to the SGT."  (*Id.* (cleaned up).)

Later in the afternoon, he was called to work his shift and told he was not fired, but "demoted from his good position to the worst position."  (*Id.* (internal quotations omitted).)  Santos alleges the demotion was "retaliation for the misconduct incident" because Hartzel was not able to fire Santos.  (*Id.*)  He further alleges that, following the misconduct, the "protest," and the fact that he was still able to work, "multiple correctional officers began making sarcastic remarks" to Santos such as "who did you snitch on" and "who did you blow," causing Santos "to feel targeted by inmates and officers for alleged rumors."  (*Id.*)  He also claims kitchen staff and officers attempted to provoke him into reacting in a way that could result in a disciplinary charge, thereby causing a "hostile, retaliatory, and discriminatory environment."  (*Id.*)

### D.    November 1, 2025 Misconduct

On November 1, 2025, when Santos reported to work, he received permission from a non-defendant correctional officer to take his weekly call.  (*Id.* at 24.)  Santos alleges that weekly calls are usually thirty minutes and that his tablet ran out of electricity, cutting off his call after eleven minutes.  (*Id.* at 25.)  He later asked Defendant Kissinger if he could use the remaining nineteen minutes of his call—representing that the other correctional officer had given him thirty minutes for the call—and Kissinger said no.  (*Id.*)  Kissinger then gave Santos a misconduct for "misrepresentation/lying to staff," causing him to be taken to "the hole."  (*Id.*; ECF No. 6-1 at

83-84.)  After a disciplinary hearing on November 3 before Defendant Akers, Santos was

sentenced to ten days of segregation.  (Compl. at 24; ECF No. 6-1 at 84.)  Akers found Santos

guilty based on Kissinger's report reflecting:

> You [meaning Santos] told the Officer you did not make your video call earlier in
> the day.  It was verified that you did.  You get 1 10 minute video call when on an
> informal adjustment.  The rules for an informal are listed on the paper you signed
> when you started your informal.  Lying to staff will not be tolerated.

(ECF No. 6-1 at 86.)  Santos appealed this sanction to the Warden, who denied his appeal.

(Compl. at 24; ECF No. 6-1 at 85.)

Santos claims his initial placement in the "hole" prior to the hearing violated his due

process rights and alleges that some of his property was lost during this incident.  (Compl. at 25.)

He claims that Defendant Correctional Officer Drozdak removed his property from cell B-130

when he was transferred to the disciplinary unit and that Defendant Correctional Officers

Claudio and Graff delivered the property to his new cell.  (*Id.*)  When Santos reviewed the

property, he discovered that three pair of sneakers valued at $115 and over $100 in commissary

items were missing.  (*Id.*)  Santos notified staff, including Officers Claudio and Graff, about the

lost property and was told that anything that was not delivered was with the Seargeant.  (*Id.*)

Despite multiple requests, he was not provided with an inventory of his property.  (*Id.*)  Santos

describes this property loss as "retaliatory."  (*Id.*)

### D.  Conditions in Disciplinary Segregation

While he was housed in the "hole," Santos asked Defendant Kissinger, "why you do this

to me" and stated, "that was petty."  (*Id.* at 25-26.)  In response, Kissinger made what Santos

describes as a "retaliatory statement" by stating, "you misrepresented and if you want you can

protest that."  (*Id.* at 26.)  Santos understood this comment to relate to the prior events

concerning Wertz and the alleged "protest" that occurred on October 25.  (*Id.*)

Additionally, on the day Santos arrived in segregation, he was evaluated by Jane Doe, a "mental health worker who conducts routin[e] check ups on inmates in the hole." (*Id.*) Santos expressed his concern that his "mental health was deteriorating" and sought to increase his medications. (*Id.*) He also relayed his concerns about having a cellmate "due to trauma from past incidents" and his concerns that he would not be able to sleep comfortably "and would be paranoid and anxious due to having a cellmate." (*Id.*) Doe said that she would "notify the provider" but "no changes were made to [his] medication and mental health." (*Id.*) Rather, Doe allegedly "made a one question assessment instead of evaluation and 'deemed [Santos] safe' knowing he was going through mental health symptoms." (*Id.* at 33.) She did the same thing on the two other occasions when she visited. (*Id.* at 26.)

While in segregation from November 1 through November 10, Santos was housed in cell D-218, which he claims was in an "inhumane, unsanitary and unsafe" condition. (*Id.* at 27.) He alleges that the toilet was "covered in thick, layered, caked up feces and urine" and had a "strong odor." (*Id.*) There were also "feces stains and smears on the walls, door, and bunks" because "inmates housed in segregation are not given the correct supplies to clean the cell." (*Id.*) Although Defendant Ramirez gave Santos and his cellmate paper towels and a spray bottle to clean the cell when Santos arrived, Ramirez told them he did not have a scrub brush to clean the toilet and that he was not "maintenance to unclog the clogged sink." (*Id*. at 28.) Santos also alleges that the toilets are programmed so that they only flush twice per hour unless you wait five minutes in between flushes, and that sometimes the toilet would lock up for the hour during which urine or feces would remain in the toilet bowl. (*Id.* at 27.) The conditions in the cell made it hard for Santos to eat, causing him to lose fourteen pounds in ten days. (*Id.*) Santos further alleges that his top bunk bed was "only about half an arms length from the bed to the

ceiling light," and that the "constant brightness combined with unsanitary conditions" made it hard to sleep or rest, aggravating his mental health.  (*Id.* at 28.)

Santos alleges that he filed grievances about these issues but many of his grievances have not been answered, were not answered in a timely fashion, or were responded to in a manner that made him "feel as if his grievances didn[']t matter."  (*Id.* at 26-27.)  On November 3, 2025, Santos spoke to Warden Smith about his "missing property" and the "inhumane condition of [his] cell," while the Warden was conducting rounds in the disciplinary segregation unit.  (*Id.* at 27, 39.)  He alleges Warden Smith directed him to the grievance system even though Santos told him that his grievances were being ignored.  (*Id*. at 27, 39, 44.)

**E.  December 2, 2025 Incident with Berroa**

The next incident of harassment Santos describes occurred on December 2, 2025.  (*Id.* at 22.)  On that date, Santos was leaving the multipurpose room with a group of inmates when he encountered Officer Berroa, causing him to feel "fear, anxiety, ptsd, [and] harassment amongst other triggers."  (*Id.*)  Although there was still a "separation," between Santos and Berroa at that point (presumably due to the PREA investigation), Berroa "antagonize[d]" Santos by saying "Santos stop talking," which caused Santos to feel "oppressed and fearful" since he had not been talking.  (*Id.*)  When Santos did not react, Berroa again told him to stop talking.  (*Id.*)  Santos then responded, "listen I'm not talking you tryna play me so ya can attack me and you already know we got a separation so why you even near me."  (*Id.*)  A correctional officer who overheard the conversation directed Santos to keep walking.  (*Id.*)  Berroa then stated, "you always crying like a [sic] little bitch keep walking."  (*Id.*)  Santos then left the unit, and Berroa walked to the "jail exit" and stated to other officers, "don't mind him he's always acting like a little bitch." (*Id.*)

When Santos arrived at his unit, he told a non-defendant officer what happened. (*Id.*) Forty-five minutes later, he was taken to the medical unit to take his evening medication. (*Id.*) There, he told Lt. Nemeth and an unknown officer about the incident with Berroa. (*Id.*) Nemeth told Santos that he would review the camera footage and interview witnesses who had seen the incident. (*Id.*) In the meantime, Santos notes that he "is in constant fear of harassment, retaliation, physical violence, getting shot by S.O.G., and anything else that officers can do to harm him." (*Id.*) He also "wrote grievances to the warden asking for separations or removal from BCJ" but he has not received a response. (*Id.*)

### F. Claims and Relief Sought

As a result of this conduct, Santos brings assorted constitutional claims pursuant to 42 U.S.C. § 1983, as well as state claims, primarily based on the harassment, retaliation, and discipline he claims to have experienced.[7] (*See, e.g.*, Compl. at 5, 17, 19-20, 30-37.) He seeks

---

[7] Santos invokes certain provisions that are either inapplicable or that do not provide any basis for a claim considering the facts alleged. For instance, Santos refers to the Americans with Disabilities Act ("ADA"), possibly in connection with allegations that he was "deemed safe" following what he believes was an inadequate medical evaluation, (Compl. at 36-37), but nothing about this, or any other allegation, suggests a basis for a disability discrimination claim. *See, e.g.*, *Kokinda v. Pa. Dep't of Corr.*, 779 F. App'x 944, 950 (3d Cir. 2019) (*per curiam*) (affirming dismissal of ADA claim where plaintiff did not allege that defendants excluded him from participation "because of his disability as required"); *See Kokinda v. Pa. Dep't of Corr.*, 663 F. App'x 156, 159 (3d Cir. 2016) (*per curiam*) ("The District Court was also correct to conclude . . . that Kokinda's ADA claims fail because the ADA prohibits disability-based discrimination, not inadequate treatment for the disability." (footnotes and internal quotations omitted)); *Nunez v. Prime Care Health, Inc.*, No. 19-0859, 2019 WL 1400466, at *1 n.3 (E.D. Pa. Mar. 27, 2019) (explaining that "decisions about a prisoner's medical treatment generally do not give rise to a claim under the ADA" and citing cases). Further, Santos cannot state a claim under PREA, to the extent he was intending to do so, because the PREA contains no private right of action. *See Bowens v. Emps. of the Dep't of Corr.*, No. 14-2689, 2016 WL 3269580, at *3 (E.D. Pa. June 15, 2016) (a plaintiff cannot "bring a private action to enforce obligations set forth in the PREA, whether through the statute itself or through [an] attempt to enforce the [institution's] PREA policy via section 1983."), *aff'd, Bowens v. Wetzel*, 674 F. App'x 133, 137 (3d Cir. 2017); *see also Krieg v. Steele*, 599 F. App'x 231, 232 (5th Cir. 2015) (noting that "other courts addressing this issue have found that the PREA does not establish a private cause of

millions of dollars in damages, a declaration that his rights were violated,[8] and injunctive relief

improving the conditions at BCJ.  (*Id.* at 7, 17, 31-32.)

## II.    STANDARD OF REVIEW

The Court will grant Santos leave to proceed *in forma pauperis* because it appears that he

is incapable of paying the fees to commence this civil action.[9]  Accordingly, 28 U.S.C. §

1915(e)(2)(B) requires the Court to dismiss the complaint if, among other things, it fails to state a

claim.  Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the

same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6),

*see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to

determine whether the complaint contains "sufficient factual matter, accepted as true, to state a

---

[8] Declaratory judgment is unavailable to litigants who seek a proclamation that their rights were violated in the past, so this request is improper.  *See, e.g.*, *Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (*per curiam*) ("Declaratory judgment is inappropriate solely to adjudicate past conduct" and is also not "meant simply to proclaim that one party is liable to another.").

[9] However, Santos is incarcerated, so he will be obligated to pay the $350 filing fee in installments in accordance with the Prison Litigation Reform Act.  *See* 28 U.S.C. § 1915(b).

claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678.

As Santos is proceeding *pro se*, the Court construes his allegations liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)). However, "pro se litigants still must allege sufficient facts in their complaints to support a claim." *Id.* (quoting *Mala*, 704 F. 3d at 245). An unrepresented litigant "cannot flout procedural rules—they must abide by the same rules that apply to all other litigants." *Id.*; *see also Doe v. Allegheny Cnty. Hous. Auth.*, No. 23-1105, 2024 WL 379959, at *3 (3d Cir. Feb. 1, 2024) (*per curiam*) ("While a court must liberally construe the allegations and 'apply the applicable law, irrespective of whether the pro se litigant mentioned it by name,' *Higgins v. Beyer*, 293 F.3d 683, 688 (3d Cir. 2002), this does not require the court to act as an advocate to identify any possible claim that the facts alleged could potentially support.").

## III.   DISCUSSION

The vehicle by which federal constitutional claims may be brought in federal court is an action under 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). As set forth in more detail below, most of Santos's allegations fall short of establishing a plausible constitutional violation.

### A.  Lack of Personal Involvement and Greivance-Based Claims

As noted, to satisfy the pleading standard, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Further, in a § 1983 action, the personal involvement of each

defendant in the alleged constitutional violation is a required element, meaning a plaintiff must allege how each defendant was involved in the events and occurrences giving rise to his claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).  In other words, a complaint must provide factual details about what each defendant did, including sufficient information about when, where, and under what circumstances the relevant events took place, to both put the defendants on notice of what they are accused of doing and to support the necessary elements of a claim.

For certain Defendants named in the Complaint—specifically, Defendants Barnhardt, Leinbach, "Berks County Commissioners," and Johnson—Santos has provided no allegations explaining what they did or did not do relative to the events in question.  They are not mentioned at all except for when they are listed among the Defendants sued.  In other words, the Complaint does not reflect how these Defendants violated Santos's constitutional rights or otherwise caused him harm.  He has therefore failed to state a claim against these Defendants.

The same is true for Defendant Marshall, whose name does not appear in the Complaint with the exception of his inclusion among the Defendants sued.  The only place this Defendant's name appears is on a grievance in the exhibits Santos attached to his Complaint, reflecting that Marshall responded to Santos's grievance about Wertz's misconduct by informing him of the proper administrative channels to address the issue, (ECF No. 6-1 at 80), and in a cover letter to the Complaint reflecting that Marshall sent a mental health counselor and a "BCC Counselor" to talk to Santos to address the grievances he filed, (Compl. at 2).  Notably, a plaintiff cannot state a claim by relying solely on exhibits.  *See Estate of Egenious Coles v. Zucker, Goldberg & Ackerman*, 658 F. App'x 108, 111 (3d Cir. 2016) ("[W]e cannot fault the District Court for failing to intuit the necessary factual allegations from one of the many exhibits appended to the

complaint." (citations and quotations omitted)); *see also Berkery v. Credit Collection Servs.*, No. 21-3809, 2021 WL 4060454, at *2 (E.D. Pa. Sept. 7, 2021) ("While a court may consider exhibits attached to a complaint, merely attaching exhibits is insufficient to meet the requirement that a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."). Regardless, if these are the bases for Santos's claims against Marshall, which is not clear given the absence of any specific allegations in the Complaint about how Marshall was directly involved in the claimed constitutional violations, they do not state a claim. Simply responding to a prisoner's grievance does not equate to personal involvement in the underlying events, *see Higgs*, 2024 WL 3811985, at *2 ("The mere investigation or adjudication of a grievance is insufficient to implicate an officer in the underlying injury, as it does not demonstrate 'personal knowledge' or violate a constitutional right for the purposes of § 1983."); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."), and any alleged failures in responding to or investigating grievances do not give rise to a constitutional claim against Marshall, Nemeth, Warden Smith or any other Defendant, *see, e.g.*, *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*) ("[P]risoners do not have a constitutional right to prison grievance procedures." (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*))); *Woods v. First Corr. Med. Inc.*, 446 F. App'x 400, 403 (3d Cir. 2011) (*per curiam*) ("We agree with the District Court that because a prisoner has no free-standing constitutional right to an effective grievance process, Woods cannot maintain a constitutional claim against Lucas based upon his perception that she ignored and/or failed to

properly investigate his grievances." (internal citation omitted)).  Accordingly, based on the current record, there is no apparent basis for a claim against Marshall.  Nor is there any basis for a claim against any of the Defendants based on how they handled Santos's grievances or investigations related to his grievances.

### B.  Harassment

Many of Santos's allegations concern verbal harassment that he experienced while incarcerated at BCJ.  In general, "[v]erbal harassment of a prisoner, although distasteful, does not violate the [constitution]."  *Washington v. Rozich*, 734 F. App'x 798, 801 (3d Cir. 2018) (*per curiam*) (citing *McBride v. Deer*, 240 F.3d 1287, 1291 n.3 (10 Cir. 2001) (threat to spray plaintiff with mace not a constitutional violation) and *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (sexually explicit language and racially derogatory language did not violate the constitution)); *see also Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015) ("Simple or complex, most verbal harassment by jail or prison guards does not rise to the level of [a constitutional violation]." (citing cases)); *Lamar v. Steele*, 698 F.2d 1286, 1286 (5th Cir. 1983) (*per curiam*) ("Threats alone are not enough.  A section 1983 claim only accrues when the threats or threatening conduct result in a constitutional deprivation.").  Although the United States Court of Appeals for the Third Circuit has not spoken precedentially on this issue, some circuit courts have recognized that verbal harassment can amount to a constitutional violation in rare instances, but only if it is sufficiently severe under the circumstances and caused tangible harm, even if only psychological.  *See Beal*, 803 F.3d at 358 (prisoner stated claim where he alleged that defendant prison guard made "verbal sexual comments" by telling plaintiff to "place his penis" inside another inmate and "urinated in full view of plaintiff" on several occasions "while smiling," such that other inmates "would harass him by calling him names such as 'punk, fag,

sissy, and queer," potentially increasing the "likelihood of sexual assaults on [plaintiff] by other inmates"); *Irving v. Dormire*, 519 F.3d 441, 449 (8th Cir. 2008) (holding that guard's "death threats" to prisoner were objectively serious under the circumstances and, accordingly, actionable under the Eighth Amendment); *Chandler v. D.C. Dep't of Corr.*, 145 F.3d 1355, 1361 (D.C. Cir. 1998) (holding that prisoner stated claim where guard's threat to kill plaintiff put him "in imminent fear of his life because [the guard] was in a position to carry it out.  Depending on the gravity of the fear, the credibility of the threat, and on [plaintiff's] psychological condition, the threat itself could have caused more than *de minimis* harm").  This approach is consistent with the law governing conditions-of-confinement claims, which requires a prisoner to allege an objectively serious deprivation to move forward on a constitutional claim.  *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007).

Santos's allegations of harassment primarily focus on Defendant Berroa in connection with the events of September 22, 2025, and December 2, 2025.  On the first occasion, Berroa berated Santos in his cell following the failed inspection by stating, "Look dick sucker why would you tell the Sgt. you cut hair on the block?  You're a dick sniffer and for being a bitch you lost your tablet for 8 days.  You're lucky I didn't fuck you up for making me look stupid and you're never going to cut hair on my block again bitch!'"  (Compl. at 16.)  Berroa made similar comments when Santos approached him after his break to negotiate a more favorable punishment.  (*Id.*)  Berroa made a third statement to Santos—who initiated the interaction and brought up Berroa's earlier comment—when he called Santos a "big mouth" and responded that if Santos had a "problem," "we can go blow for blow like men" (which Santos responded to by essentially inviting Berroa to his cell for the opportunity).  (*Id.*)  Santos claims the incident triggered his post-traumatic stress disorder and anxiety, "heightened" his mental health

conditions such that he ultimately had to increase his medications, and "made him appear as a target to other inmates heightening his fear for his personal safety." (*Id.* at 16, 17.)  The next incident with Berroa occurred on December 2, 2025, when Santos passed Berroa, with whom he had a separation, in the hall and Berroa told him to "stop talking" and called him a "bitch." (*Id.* at 22.)

These two incidents with Berroa, which occurred over the course of approximately two months, do not rise the level of a constitutional violation.  Berroa's statements, while inappropriate and unprofessional, amount to name-calling.  Although Santos alleges that the use of "homophobic" and "sexual" slurs "made him appear as a target to other inmates, causing fear for his safety, (Compl. at 16, 18), there are no allegations in the Complaint suggesting that other inmates were, in fact, influenced by Berroa's comments to target or harm Santos.[10]  *Compare McIntosh v. United States*, 845 F. App'x 88, 91 (3d Cir. 2021) (*per curiam*) (concluding that plaintiff stated a claim where he alleged "that he was slandered by inmates & staff with names like: chomo [child molester] & raper motherfuckers" and that prison staff "called him names that implied he was a sex offender" (citing *Beal*, 803 F.3d at 358)).  Cases addressing similar use of inappropriate, unprofessional language and conduct (some worse than that alleged by Santos), have concluded that such statements do not violate the constitution, even where a plaintiff

---

[10] To the contrary, Santos obtained witness statements, which he appended to the Complaint, from the inmates who allegedly heard the interactions, suggesting he does not fear those inmates. (*Compare* Compl. at 16 *with* ECF No. 6-1 at 91.)  Another witness statement that Santos submitted in support of his claims asserts that the witness overheard the statements Berroa made to Santos on that date and that Berroa regularly says "sexual derogatory things" to inmates. (Compl. at 49.)  Santos similarly alleges that the inmates who overheard Berroa commenting that the block was "boring" and that he was waiting for someone to "fight" him ignored the comment because it was typical of Berroa's behavior. (*Id.* at 16.)  These allegations further suggest that Santos was not necessarily singled out or put at risk among the prison population.

alleges psychological side effects, as Santos does here.[11]  *See, e.g.*, *Washington v. Wetzel*, No.

22-2182, 2024 WL 5154024, at *2 (3d Cir. Dec. 18, 2024) (*per curiam*) (no claim stated where

defendant "continuously called [plaintiff] 'no teeth,' 'rapist,' and several offensive names, and

that Miller threatened him with harm and taunted him"); *Perkins v. Koehler*, No. 24-1508, 2024

WL 4835249, at *3 (7th Cir. Nov. 20, 2024) ("Although we have acknowledged that harassment

so cruel as to inflict significant psychological harm can violate the Eighth Amendment,

harassment that is 'fleeting' or 'simple' does not rise to that level.  Here, Perkins cites one

interaction with Cushing that did not involve especially 'severe' or 'devasting' content [*i.e.*,

saying the plaintiff was gay].  Furthermore, the only harm Perkins alleges is the worsening of his

psychological conditions and his fear that other inmates will target him.  But prisoners cannot

bring suit based on mental or emotional injury alone." (citations omitted)); *Manuel v. Capozza*,

No. 24-1396, 2024 WL 3594363, at *1, *3 n.4 (3d Cir. July 31, 2024) (*per curiam*) (concluding

that correctional officer's statement, in response to plaintiff's request for medical care, "that

'nobody cares for you here,' and 'when you die nobody will care.  You will be dead before your

days back here are over'" were "cruel words" that did not amount to a constitutional violation);

*Tate v. Wiggins*, 805 F. App'x 159, 161 (3d Cir. 2020) (*per curiam*) (affirming dismissal on

---

[11] Instances in which verbal harassment has been found to allege a constitutional violation have involved much more serious conditions and circumstances.  *See Lisle v. Welborn*, 933 F.3d 705, 718 (7th Cir. 2019) ("With the understanding that the Eighth Amendment also protects psychologically vulnerable inmates against psychological pain deliberately inflicted by correctional officers, Nurse South's alleged statements, if made, went beyond 'simple verbal harassment.'  She is alleged to have taunted and encouraged an inmate known to be suicidal and in the midst of a mental health crisis to take his own life."); *Toliver v. City of New York*, 530 F. App'x 90, 92 (2d Cir. 2013) ("Viewed in context and in the light most favorable to Toliver, the officers' harassing conduct on September 4, 2010 amounted to more than verbal taunts.  The conduct alleged included explicitly retaliatory threats made by a group of officers that included at least one who allegedly had already physically abused Toliver.  Furthermore, the officers' threats that they would 'break [Toliver's] bones' if he attempted to shower were arguably linked to deprivations.").

screening of claims based on defendant who "became hypersexual, exclaiming strong sexual obscenities, grinding his backside on inmates' cell doors, while confessing that his prejudice as a decision maker during misconduct hearings was only in fact because the inmates don't 'lick enough ass,'" which plaintiff claimed caused "sexual trauma" (cleaned up)); *In re Eric Watkins Litig.*, 829 F. App'x 428, 431 (11th Cir. 2020) (distinguishing between "demeaning homosexual comments and gestures," which are not actionable under the constitution, with allegations that prison guard "angrily and repeatedly threatened to rape" plaintiff, which the court noted was not a frivolous claim without concluding a claim was stated); *Bowens v. Wetzel*, 674 F. App'x 133, 137 (3d Cir. 2017) (*per curiam*) (agreeing with district court that plaintiff "failed to plead sufficient factual matter to state a claim against those officials whom he charges as deliberately indifferent to sexual harassment and the mental anguish he alleges he suffered"); *McCormick v. Kline*, 670 F. App'x 764, 765 (3d Cir. 2016) (*per curiam*) (affirming district court's dismissal of complaint without leave to amend where plaintiff alleged that a correctional officer violated his rights "by standing outside [plaintiff's] cell while licking his lips in a sexually suggestive manner and referring to a previous alleged assault committed against [plaintiff] by a doctor at S.C.I. Graterford" and stating "without additional detail, that 'this is not the first time issues like this occurred'"); *Dunbar v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012) ("[T]he display of white pillowcase hoods, Nazi salutes, and the posting of an offensive picture, while unprofessional and reprehensible, do not amount to a violation of constitutional rights, even if those things occurred"); *McKay v. U.S. Dep't of Just.*, 406 F. App'x 570, 570 n.1 (3d Cir. 2010) (*per curiam*) (allegations that prison staff called plaintiff a "faggot" "would be unlikely to prevail" because "verbal harassment does not rise to the level of a constitutional violation"); *see also Leiser v. Kloth*, 933 F.3d 696, 704 (7th Cir. 2019) (guard was entitled to qualified immunity from claim

that he was intentionally standing behind inmate with PTSD, which was triggering, absent medical directive that guard was required to modify his behavior: "Leiser's claim here implies that prison staff have a constitutional obligation to modify the way they do their jobs based solely on an inmate's assertion that their actions elicit extreme psychological responses. We must recognize the risk that such a rule of law, which would apply without orders from prison medical staff, could create a real danger of inmates manipulating correctional officers for purposes unrelated to their mental health."). For these reasons, Santos has not stated a plausible claim based on the manner in which Berroa spoke to him. Since the other allegations of "verbal harassment" attributed to other Defendants are fleeting and far less severe, they too do not amount to a constitutional violation.

### C. Due Process Claims

#### 1. Misconducts

The Court understands Santos to be bringing due process claims based on the disciplinary sanctions imposed against him. The Due Process Clause prevents "punishment of a pretrial detainee for his alleged criminal conduct, committed *prior* to his detention, for which he has not yet been convicted." *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017) (citing *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979)). "[D]etention officials' restrictions on pretrial detainees will constitute punishment prohibited by the Due Process Clause when: (1) there is a showing of express intent to punish on the part of those officials; (2) the restriction or condition is not rationally related to a legitimate non-punitive government purpose, i.e., if it is arbitrary or purposeless; or (3) the restriction is excessive in light of that purpose." *Id.* Given the need to maintain internal security, "a showing by the prison officials that a restrictive housing assignment is predicated on a legitimate managerial concern and is therefore not arbitrary or

purposeless, will typically foreclose the substantive due process inquiry." *Stevenson*, 495 F.3d at 69.

In that regard, prisons may generally "sanction a pretrial detainee for misconduct that he commits while awaiting trial, as long as it is not a punishment for the 'underlying crime of which he stands accused.'" *Kanu v. Lindsey*, 739 F. App'x 111, 116 (3d Cir. 2018) (quoting *Rapier v. Harris*, 172 F.3d 999, 1003-06 (7th Cir. 1999)). However, "greater process [is] accorded to prisoners who are confined for disciplinary infractions than those moved for purely administrative reasons." *Stevenson*, 495 F.3d at 70. Such process "include[s] the right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence." *Kanu*, 739 F. App'x at 116 (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-66 (1974)); *see also Stevenson,* 495 F.3d at 70-71. "[T]he filing of a fraudulent misconduct report and related disciplinary sanctions do not without more violate due process," *Seville v. Martinez*, 130 F. App'x 549, 551 (3d Cir. 2005) (*per curiam*), as "[d]ue process is satisfied where an inmate is afforded an opportunity to be heard and to defend against the allegedly false misconduct reports," *Thomas v. McCoy*, 467 F. App'x 94, 97 (3d Cir. 2012) (*per curiam*); *see also Smith v. Mensinger*, 293 F.3d 641, 654 (3d Cir. 2002) ("[S]o long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim.").

Santos has not alleged a plausible basis for a due process claim based on the misconduct charges issued against him. Regarding the September 22 incident, Santos was not at risk of disciplinary confinement and the only sanction was the loss of his tablet privileges, a *de minimis*

deprivation that does not implicate the constitution.[12]  *See Collins v. Ainsworth*, 382 F.3d 529,

545 (5th Cir. 2004) (finding denial of phone calls and mattresses for less than 24 hours to be *de*

*minimis*); *Robles v. Prince George's Cnty., Md.*, 302 F.3d 262, 269 (4th Cir. 2002) (for pretrial

detainee to prevail on his due process claim, "it is necessary to find that the officers' actions

amounted to punishment and were not merely an incident of some other legitimate governmental

purpose, and that the injury resulting from their actions was more than de minimis" (cleaned

up));  *Kenny v. Foster*, 87 F.3d 1320, 1996 WL 328797, at *3 (9th Cir. 1996) ("The other

instances of minor discipline imposed on Kenny, such as suspension of commissary privileges,

do not rise to a level that implicates constitutional protections."); *see also Bell*, 441 U.S. at 539

n.21 ("There is, of course, a *de minimis* level of imposition with which the Constitution is not

concerned." (internal quotations omitted)).

    As to the October 25 misconduct, it is apparent from the facts alleged that Santos was

told of the nature of the misconduct and given the opportunity to plead guilty to receive a lesser

sanction—which he did—to forego disciplinary proceedings and placement in disciplinary

segregation.  (Compl. at 23-24.)  He does not explain how this action violated his due process

rights.  *See McDowell v. Litz*, 419 F. App'x 149, 151 (3d Cir. 2011) (*per curiam*) ("McDowell

has never explained how his rights were allegedly violated in the first action (in which he

pleaded guilty), so we will affirm the District Court's judgment on that claim without further

discussion.").  Santos was also notified as to the November 1 misconduct that he was being

---

[12] Such a sanction is contemplated by the facility's handbook, which provides that "[t]ablet
privileges may be restricted if [an inmate is] issued a unit action or a misconduct citation
including those that are handled through an informal adjustment."  (ECF No. 6-1 at 29.)
Further, to the extent Santos sought to use his tablet to connect with family or conduct
unspecified legal research, he does not allege that he could not do so via other means.

charged with "misrepresentation/lying to staff," and he acknowledges that he was given a disciplinary hearing on November 3, which he also had the opportunity to appeal. (Compl. at 25.) These allegations, and his own exhibits, reflect that Santos received the process due under the circumstances. *Richardson v. Sherrer*, 344 F. App'x 755, 758 (3d Cir. 2009) (*per curiam*) ("Richardson does not allege that he was denied a hearing or an opportunity to present a defense. Therefore, to the extent Richardson asserts a due process violation, the District Court properly dismissed his claim."). Although he notes that he was transferred to restricted housing when he received the misrepresentation charge prior to receiving any process, (*see* Compl. at 25 (stating Santos was "immediately taken to the hole/segregation without[t] any hearing, review, or opportunity to contest the allegations")), in this context "the procedural requirements do not need to be met before the inmate is transferred." *Quiero v. Ott*, 799 F. App'x 144, 148 n.6 (3d Cir. 2020); *see also Dilworth v. Adams*, 841 F.3d 246, 255 (4th Cir. 2016) (explaining that jails are not "barred from taking immediate action, without a prior hearing" when an inmate is charged with a disciplinary infraction); *Stevenson*, 495 F.3d at 70-71 ("Due to the unique exigencies of prison management," the process afforded to an inmate charged with a disciplinary infraction "need not occur prior to the transfer of a detainee"). In sum, Santos has failed to state a plausible due process claim based on the misconducts described in his Complaint.

### 2. Lost Property

Allegations that Defendants Drozdak, Graff, and Claudio violated Santos's due process rights by confiscating or losing his property cannot form the basis of a due process claim. Unauthorized intentional deprivations of property "[do] not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer*, 468 U.S. 517,

533 (1984).  A correctional facility's grievance procedure provides an adequate postdeprivation remedy for intentional deprivations of property by correctional employees.  *Tillman v. Lebanon Cnty. Corr. Facility,* 221 F.3d 410, 422 (3d Cir. 2000) (holding that prison grievance system provides adequate post-deprivation remedy); *see also Mbewe v. Delbalso*, No. 23-2054, 2024 WL 510500, at *3 (3d Cir. Feb. 9, 2024) (*per curiam*) (affirming dismissal of due process claim: "The prison grievance procedure provides an adequate post-deprivation remedy, and the existence of this post-deprivation remedy forecloses [plaintiff's] due process deprivation of property claim" (citation omitted)); *Ransome v. Longstreth*, No. 23-1726, 2023 WL 6122139, at *2 (3d Cir. Sept. 19, 2023) (*per curiam*) (existence of prison grievance process precluded due process claim, even where prisoner alleged violations of the grievance policy).  "Even if the prison grievance procedures could be considered constitutionally inadequate, Pennsylvania's state tort law would provide an adequate remedy."  *Hernandez v. Corr. Emergency Response Team*, 771 F. App'x 143, 145 (3d Cir. 2019) (*per curiam*) (citing 42 Pa. Cons. Stat. Ann. § 8522(b)(3)); *see also Lawson v. Ferguson*, No. 22-2365, 2023 WL 2770820, at *3 n.3 (3d Cir. Apr. 4, 2023) (*per curiam*) ("Even if the prison's grievance procedures were inadequate to address Lawson's claims, state tort law could serve as an adequate post-deprivation remedy."). Accordingly, the Court will dismiss any due process claims based on these allegations.

### 3.  **Prison Job**

Santos appears to bring a due process claim against Defendant Hartzel based on the demotion to less preferred work at his kitchen job.   However, "[i]nmates do not have a liberty or property interest in their job assignments that would give rise to Due Process Clause protection." *Watson v. Sec'y Pa. Dep't of Corr.*, 567 F. App'x 75, 78 (3d Cir. 2014) (*per curiam*) (citing *James v. Quinlan*, 866 F.2d 627, 629-30 (3d Cir. 1989))); *Fiore v. Holt*, 435 F. App'x 63, 68 (3d

Cir. 2011) (*per curiam*) ("[P]risoners enjoy no protected interest in prison employment."). For this reason, any due process claims predicated on Santos's demotion are dismissed.

### 4.  Conditions in the Hole

Santos also brings due process claims based on the conditions of the cell where he was housed for ten days in disciplinary segregation. Prison officials have a constitutional duty to provide humane conditions of confinement, including adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates. *See Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994) (internal quotation and citation omitted). To establish a basis for a Fourteenth Amendment violation, a pretrial detainee must allege that his conditions of confinement amount to punishment. *Bell*, 441 U.S. at 538; *Camps v. Giorla*, 843 F. App' x 450, 452 (3d Cir. 2021) (*per curiam*) ("[A] court must determine whether the conditions complained of were imposed for the purpose of punishment or whether it is merely incidental to a legitimate governmental objective."). "Unconstitutional punishment typically includes both objective and subjective components." *Stevenson*, 495 F.3d at 68. "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component asks whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations and alterations omitted). To satisfy the subjective component of the analysis, a prisoner generally must assert that prison officials acted with deliberate indifference, meaning that they consciously disregarded a serious risk to the detainee's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991); *see Edwards v. Northampton Cnty.*, 663 F. App'x 132, 135 (3d Cir. 2016) (*per curiam*) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners and pretrial detainees." (internal citations omitted)).

Only conditions of confinement that "cause inmates to endure such genuine privations and hardship over an extended period of time" violate the Fourteenth Amendment. *Hubbard v. Taylor*, 538 F.3d 229, 233 (3d Cir. 2008) (internal quotations omitted). "In determining whether the conditions of confinement amount to a constitutional violation, the circumstances, nature, and duration of the conditions must be carefully considered but the length of exposure is often of prime importance." *Martin v. Gearhart*, 712 F. App'x 179, 186 (3d Cir. 2017) (*per curiam*) (cleaned up) (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)). Courts "look at the totality of the conditions" in assessing conditions-of-confinement claims. *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990); *see also Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020) (in assessing whether conditions amount to unconstitutional punishment of detainees, courts "consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time").

Santos alleges that the cell where he spent his ten-day disciplinary sentence was smeared with feces and had a feces-caked toilet, the limited ability to flush the toilet exacerbated the smell, he was not given proper cleaning supplies, and the unsanitary conditions made him unable to eat such that he lost fourteen pounds in ten days. Merely having to eat next to a toilet omitting unpleasant odors does not amount to a constitutional violation. *See, e.g.*, *Horst v. Litz*, No. 23-00917, 2023 WL 4827077, at *3 (M.D. Pa. July 27, 2023) (allegations that plaintiff "must eat in his cell next to the toilet which leaks and doesn't always flush, that there is mold in the cell, that there is toothpaste on the walls, that no cleaning products are provided, and that he can smell sewage and other body smells" described conditions that were "undoubtedly uncomfortable," but did not constitute "a sufficiently serious deprivation (*i.e.*, a denial of one of life's necessities) such that [plaintiff] is facing a substantial risk of serious harm." (internal quotations and citation

omitted)); *Alston v. George Little, P.A.*, No. 22-0183, 2023 WL 5943456, at *9 (W.D. Pa. May

15, 2023) (allegation that inmate was "forced to eat cold food inside of his cell next to a toilet"

did not support a plausible inference that the plaintiff had been subjected to an objectively,

sufficiently serious condition of confinement), *report and recommendation adopted sub nom.*

*Alston v. Little*, No. 22-183, 2023 WL 5199580 (W.D. Pa. Aug. 14, 2023); *Walters v. Berks*

*Cnty. Prison*, No. 11-6357, 2012 WL 760849, at *1 (E.D. Pa. Mar. 9, 2012) (inmate alleging that

he was "forced to eat and sleep directly next to a toilet" that "emitt[ed] unpleasant odors" did not

state a constitutional claim), *aff'd sub nom. Walters v. Muhlenburg Twp. Police Dep't*, 536 F.

App'x 213 (3d Cir. 2013).  Nor is the constitution violated by institutional limits on flushing a

toilet, even when inhabitants in the cell are occasionally exposed to odors from unflushed waste.

*See Holloway v. Wetzel*, No. 22-2111, 2023 WL 1793905, at *1 (3d Cir. Feb. 7, 2023) (*per*

*curiam*) ("[T]he presence of feces in the toilet before the hourly flushing reset created seemingly

unpleasant conditions, but the limit on flushing . . . did not constitute unconstitutional conditions.

To the extent that Holloway alleged the policy was detrimental to his health, he did not allege it

caused or exacerbated any serious medical condition.").

      Here, however, Santos also alleges that his cell was smeared with feces and his toilet was

caked with feces, that he was not provided with supplies to adequately clean it, and that it

smelled so bad he was unable to eat, causing him to lose fourteen pounds in ten days.  Since

"exposure to human waste carries particular weight in the conditions calculus," *Martin*, 712 F.

App'x at 187 (quoting *DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001)), even relatively

short exposures to human waste have been found to violate the constitution, *DeSpain*, 264 F.3d

at 974 ("Exposure to human waste, like few other conditions of confinement, evokes both the

health concerns emphasized in *Farmer* and the more general standards of dignity embodied in

the Eighth Amendment." (citing cases)).  It is hard to see how requiring an inmate to reside in a feces-covered cell with a feces-caked toilet without the ability to clean it properly would be related to a legitimate penological interest.  Further, Santos alleges that the severity of the conditions caused a dramatic weight loss.  He further alleges an inability to sleep due to the constant brightness of the lights, which courts have found actionable.  *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 374 (3d Cir. 2019) ("[B]right, constant illumination that causes grave sleeping problems and other mental and psychological problems can establish an Eighth Amendment deprivation." (internal quotations omitted)).  He has therefore alleged sufficient facts to proceed against Ramirez (who was aware of the conditions and did not provide adequate cleaning supplies) and Warden Smith (with whom Santos discussed the conditions but who told Santos to put in a grievance even though Santos told him that his grievances had been ignored) based on the conditions of this cell.  *See Pressley v. Miller*, No. 21-2826, 2022 WL 17414866, at *1 (3d Cir. Dec. 5, 2022) (*per curiam*) (vacating grant of summary judgment on conditions claim where plaintiff was housed in a RHU cell "contaminated by human feces (smeared on the walls, bed, air vent, and cell door, and covering the 'feeding slot')" where he was housed "for three days and refused his meals for much of that time because of the conditions of the cell").

### 5.  Deliberate Indifference to Medical Needs

Santos also alleges that he was denied medical treatment during his ten-day stay in disciplinary segregation.  When medical treatment is at issue, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs.  *See Farmer*, 511 U.S. at 835.  "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cnty. Corr. Institutional Inmates v.*

*Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted).  Deliberate indifference

in this context is properly alleged "where the prison official (1) knows of a prisoner's need for

medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment

based on a non-medical reason; or (3) prevents a prisoner from receiving needed or

recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Allegations of medical malpractice and mere disagreement regarding proper medical treatment

are insufficient to establish a constitutional violation.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d

Cir. 2004).  Further, "[w]here a prisoner has received some medical attention and the dispute is

over the adequacy of the treatment, 'federal courts are generally reluctant to second guess

medical judgments and to constitutionalize claims which sound in state tort law.'" *Davis v.

Superintendent Somerset SCI*, 597 F. App'x 42, 45 (3d Cir. 2015) (*per curiam*) (quoting *United

States ex rel. Walker v. Fayette Cnty.*, 599 F.2d 573, 575 n.2 (3d Cir. 1979)).

   Santos's claims of medical deliberate indifference correlate with the actions of a Jane

Doe "mental health worker" who was not identified as a Defendant but against whom it appears

Santos seeks to assert claims.  (Compl. at 26.)  The basis for this claim is that Santos told Doe

while he was in disciplinary segregation that his mental health was worsening and that he wanted

to adjust his medication, but despite having this conversation with her, he did not receive any

changes in his mental health regimen; rather, when Doe visited the unit, she repeatedly "deemed"

him "safe."  (*Id.* at 26, 38-39.)  It is apparent from the Complaint that Santos has been diagnosed

with various mental health conditions for which he takes medication, which qualify as serious

medical needs.  (*Id.* at 26, 50); *Goodrich v. Clinton Cnty. Prison*, 214 F. App'x 105, 111 (3d Cir.

2007) ("A mental illness may constitute a serious medical need.").  However, he does not allege

that he was wholly denied his medication for the ten days he was in disciplinary segregation and

his own allegations reflect that he was regularly seen by Doe, a mental health worker, who evaluated him and concluded, in her medical judgment, that he was "safe." Further, the Complaint implies that Santos eventually saw a psychiatrist who increased his medication, although it is not entirely clear how that came about or when. (Compl. at 21 (alleging that certain Defendants' conduct resulted in "additional counseling and medical adjustments").) Given these sparse and undeveloped facts, Santos has not alleged sufficient factual information to support an inference that Doe acted with deliberate indifference by failing to facilitate a medication increase during the ten days Santos was in disciplinary segregation and deeming him "safe" after evaluating him.[13] *See Tolentino v. Smucker*, 855 F. App'x 822, 824 (3d Cir. 2021) (*per curiam*) ("Here, Tolentino alleges that he received continuous medical treatment for his anxiety and PTSD, but that, at times, he was not prescribed his preferred medication. His allegations do not indicate that the medical treatment decisions fell below any profession standards of care. Rather, his allegations amounted to disagreements in treatment, and are therefore not actionable."); *Parks* v. *Edinger*, 663 F. App'x 124, 126 (3d Cir. 2016) (*per curiam*) (no deliberate indifference where "the record shows that [plaintiff's] mental health condition was consistently evaluated and treated while at the prison"); *Williams v. Barrow*, 559 F. App'x 979,

---

[13] The Complaint does not suggest a basis for a deliberate indifference claim against the other Defendants, none of whom appear to be medically trained or aware of a need for medical care beyond what Santos was receiving. Santos claims that he was "never called for psych for the trauma" to which Berroa allegedly subjected him, (Compl. at 26), but he does not allege with any specificity that he required immediate medical attention. Although he alleges that he spoke to Defendant Nemeth shortly after the second incident with Berroa on December 2, 2025, and that he was visibly "shaken up," he did so while he was at the medical department taking his evening medication. (Compl. at 22.) It is unclear what, if anything, Santos believes Nemeth should have done considering that Nemeth is a correctional Lieutenant, not a psychologist. *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993) (non-medical defendants not deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor").

984 (11th Cir. 2014) (*per curiam*) (deliberate indifference claim was properly dismissed, where plaintiff alleged that a doctor "decreased and eventually discontinued [plaintiff's] pain medication despite his complaints that his pain was worsening" because the decision was a "classic medical judgment" and there was no indication the doctor knew plaintiff would be subjected to a "substantial risk of serious harm").

### 6. S.O.G Officers

The Court understands Santos to be bringing claims against the S.O.G. Officers, because they "walk[] around with loaded rubber bullet shotguns all day throughout the jail," which intimidates Santos.[14]  (Compl. at 29.)  Other than Santos's generalized and subjective sense of fear, he has not described in any way how these officers caused him objectively serious harm or acted with deliberate indifference to his health or safety.  Notably, the Complaint does not describe any instances during which these officers discharged their weapons erroneously, inappropriately, or at all.  Accordingly, Santos has not alleged a plausible claim against the S.O.G. Officers.  *See generally Porro v. Barnes*, 624 F.3d 1322, 1329 (10th Cir. 2010) ("The use of tasers in at least *some* circumstances—such as in a good faith effort to stop a detainee who is attempting to inflict harm on others—can comport with due process.").

---

[14] The Special Operations Group is described in the Berks County Jail System Inmate Handbook, as follows:

> SOG Operators have been assigned to work in the Jail System to increase your safety and to protect the lives of those who live and work here.  In the course of carrying out their duties, these operators and/or supervisory custody staff may video and audio record incidents/events and those involved in them.

(ECF No. 6-1 at 9.)

### D. Retaliation Claims

Santos describes many of the events at issue in his Complaint as having been motivated by retaliation. To state a plausible First Amendment retaliation claim, a prisoner must allege that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001); *see also Watson v. Rozum*, 834 F.3d 417, 422-23 (3d Cir. 2016). A prisoner's filing of a grievance or PREA complaint or expressing an intent to do so constitutes constitutionally protected conduct. *Watson v. Rozum*, 834 F.3d 417, 422-23 (3d Cir. 2016); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003); *see also Naranjo v. Walter*, No. 22-3435, 2023 WL 5928506, at *2 (3d Cir. Sept. 12, 2023) (*per curiam*). In contrast, "backtalk by prison inmates to guards, like other speech that violates prison discipline, is not constitutionally protected." *Kervin v. Barnes*, 787 F.3d 833, 835 (7th Cir. 2015).

"An adverse consequence 'need not be great in order to be actionable[;]' rather, it need only be 'more than *de minimis*.'" *Watson*, 834 F.3d at 423 (quoting *McKee v. Hart*, 436 F.3d 165, 170 (3d Cir. 2006)) (alterations in original). "[B]eing placed in lockdown, being moved to restricted housing, and being issued misconduct charges are more than '*de minimis*' adverse actions." *Palmore v. Hornberger*, 813 F. App'x 68, 70 (3d Cir. 2020) (*per curiam*) (quoting *McKee*, 436 F.3d at 170). "To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Ruttle v. Brady*, No. 22-3000, 2023 WL 5554648, at *2 (3d Cir. Aug. 29, 2023)

(quoting *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)); *see also*

*Watson*, 834 F.3d at 424.  Further, an inmate cannot prevail on a retaliation claim if a reasonable

fact-finder could conclude that the disciplinary action was "reasonably related to legitimate

penological interests" rather than a retaliatory motive.  *Carter v. McGrady*, 292 F.3d 152, 159

(3d Cir. 2002); *see also Watson*, 834 F.3d at 426.

### 1. Retaliatory Misconducts

Santos's allegations do not plausibly establish retaliation claims based on the

misconducts he received.  With respect to the eight-day loss of tablet privileges following the

"Unit Action Notification" given to him by Berroa on September 22, 2025, for possessing combs

with missing teeth (a "unit rule violation") and threatening to fight (a "disturbance"), Santos's

own allegations acknowledge that he did, in fact, do both of the things he was charged with

doing.  (Compl. at 16, 18; ECF No. 6-1 at 69-70; *see also* ECF No. 6-1 at 51 (describing Class II

disciplinary infractions).)  Further, the Complaint does not describe any protected conduct that

preceded Berroa's imposition of discipline on that date.  Rather, according to Santos's own

telling, Berroa imposed discipline for the combs prior to any discussion he had with Santos on

the subject.  And contrary to Santos's effort to characterize his speech as an effort to "question

Officer Berroa's prior comment and [seek] clarification"—speech for which he claims he was

retaliated against (Compl. at 17)—his "backtalk . . . is not constitutionally protected." *Kervin*,

787 F.3d at 835; *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (holding that "comment

that the hearing officer was 'a foul and corrupted bitch'" was a misconduct violation that was not

protected); *Cowans v. Warren*, 150 F.3d 910, 912 (8th Cir. 1998) (*per curiam*) (holding that

inmate failed to state a retaliation claim based on "accurate claims by Warren and Brown that

Cowans was guilty of violation of Rule # 21 for using abusive and insulting language").

Accordingly, Santos has not stated a retaliation claim based on Berroa's imposition of discipline on September 22, 2025.  *See Bullock v. Buck*, 611 F. App'x 744, 748 (3d Cir. 2015) (*per curiam*) (rejecting retaliation claim based on misconduct:  "Here, notably, *Bullock's own version* of the incident pointed to evidence of insolence; he stated that he went to Buck's office to 'tell [Buck] that he didn't need to grab me like that,' which could reasonably be interpreted as insolent in a prison context").

With respect to the October 25, 2025 misconduct issued by Wertz and Cancel, Santos alleges that he was "accused of being the alleged 'ringleader'" because he had "past grievance issues with Wertz."  (Compl. at 23.)  However, the Complaint does not describe the nature or timing of those past grievances or provide any facts from which one could infer either that Wertz was aware of those grievances or motivated by them.  Accordingly, Santos has not alleged a retaliation claim based on the October 25 incident.  *See, e.g.*, *Fritz v. Cnty. of Westmoreland*, No. 22-2999, 2024 WL 808970, at *3 (3d Cir. Feb. 27, 2024) (affirming dismissal of First Amendment retaliation claim where plaintiff's allegations as to causation were conclusory and speculative); *Miller v. Metzger*, No. 21-2223, 2022 WL 4820322, at *2 (3d Cir. Oct. 3, 2022) (*per curiam*) (affirming dismissal of First Amendment retaliation claim where plaintiff failed to provide sufficient factual matter showing that alleged protected activity was a substantial or motivating factor in the decision to discipline him); *McGinnis v. Hammer*, 751 F. App'x 287, 292 n.2 (3d Cir. 2018) (*per curiam*) ("McGinnis' conclusory allegation that his grievance was a substantial motivating factor in Hammer's decision to deny ibuprofen fails to reflect more than a sheer possibility that a defendant has acted unlawfully.").

Nor has Santos alleged a retaliation claim against Kissinger based on the November 1, 2025 misconduct for lying/misrepresentation.  With respect to this instance, Santos claims that

while in the hole, he asked Kissinger why he issued the misconduct and Kissinger responded, "you misrepresented and if you want you can protest that." (Compl. at 26.) Santos understood this statement to be "in context with prior events including Defendant Wertz as retaliation tied to [his] earlier involvement in an alleged 'protest' and grievances against staff." (*Id.*) However, as noted above, the Complaint does not describe any prior grievances Santos filed against Wertz or staff other than Berroa (and those allegations are not in any way tied to the November 1 misconduct). Nor does he allege that Kissinger was aware of any such grievances. Further, Santos's belief that Kissinger's use of the word "protest" reflected retaliatory intent based on the earlier incident with Wertz is too speculative to support an inference of retaliation and causation. *See generally Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ("Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed."); *Oliver v. Roquet*, 858 F.3d 180, 195 (3d Cir. 2017) ("Absent supporting facts that make it reasonable to draw an inference of retaliation, these conclusory assertions of a cause-and-effect relationship between specific protected activities and a later adverse action are insufficient to plead causation."). In sum, Santos has not stated a plausible retaliation claim based on the misconducts issued against him.

### 2. Retaliatory Harassment

At times, Santos describes statements made by Berroa, Wertz, and Kissinger as retaliatory. (*See, e.g.*, Compl. at 18, 23.) "[N]either the United States Supreme Court nor this Circuit has defined with specificity the contours of when a threat constitutes an adverse action in the official-detainee setting." *Wilson v. Zielke*, 382 F. App'x 151, 153 (3d Cir. 2010). However, unpublished cases in this Circuit addressing retaliation claims in the prison context have found threats or other verbal harassment insufficiently adverse to sustain a retaliation claim when only

isolated, minor, or non-recurring incidents of verbal harassment are alleged.[15]  *See, e.g.*, *Dunbar*, 487 F. App'x at 723 ("[T]he verbal threats and few gestures of racial harassment Dunbar allegedly encountered [which included officers performing Nazi salutes and putting pillowcases on their heads to mimic Ku Klux Klan hoods] are not sufficiently adverse to support a retaliation claim under the circumstances of this case"); *Burgos v. Canino*, 358 F. App'x 302, 306 (3d Cir. 2009) (*per curiam*) ("[T]hreats alone do not constitute retaliation.").  In line with these cases, Berroa, Wertz, and Kissinger's statements—which amount to four incidents over the course of two-and-a-half months, two of which involved name-calling by Berroa and the other of which are facially benign—do not support a retaliation claim.  *See Naranjo*, 2023 WL 5928506, at *2 (concluding that "name-calling," specifically, that a defendant called plaintiff a "pussy," "fagg," and "rat," "although temporally linked to [plaintiff's] earlier request to file a PREA complaint, was insufficiently adverse to deter a person of ordinary firmness from exercising his First Amendment rights." (internal quotation omitted)); *Green v. Wetzel*, No. 18-93, 2019 WL 1426955, at *8 (W.D. Pa. Mar. 29, 2019) ("Plaintiff's attempt to distill this exchange into a constitutional retaliation claim is unavailing. Because verbal threats and comments are not adverse actions, Santos' sarcastic comments during Plaintiff's meeting are not actionable.").  In any event, the alleged threats and harassment are not plausibly tied to any protected conduct in a manner that would support a retaliation claim.

### 3.  Retaliatory Loss of Kitchen Assignment

---

[15] This is consistent with approaches taken in some other Circuits.  *See Walker v. Senecal*, 130 F.4th 291, 300 (2d Cir. 2025) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass. While incidents that are relatively minor and infrequent will not meet that standard, retaliatory conduct reflecting a pattern of nearly constant harassment will do so.").

Santos alleges that Hartzel demoted him at his kitchen job in retaliation "for the misconduct incident" with Wertz after learning he was not able to fire him. (Compl. at 24.) "[T]he termination of prison employment constitutes adverse action sufficient to deter the exercise of First Amendment rights." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017) (citing *Williams v. Meese*, 926 F.2d 994, 998 (10th Cir. 1991) ("[A prisoner] has no right to a job . . . [but] prison officials cannot punish [him for] exercising his first amendment rights by denying him certain job assignments or transferring him from one job to another"). However, Santos himself describes the demotion as having been imposed as a consequence for having received a misconduct. But neither receiving a misconduct nor talking back to an officer in a manner that would justify a misconduct, amounts to protected activity. *See supra.* Accordingly, this claim fails as well; simply using the word "retaliation" to describe conduct does not make the retaliation claim plausible. *See Wallace v. Pa. Dep't of Corr.*, No. 24-152, 2025 WL 1568665, at *7 (W.D. Pa. June 3, 2025) ("Using the word 'retaliation' or some form thereof does not allege retaliation.").

### 4. Retaliatory Loss of Property

Santos also describes the loss of his property following his transfer to disciplinary segregation as "retaliatory." (Compl. at 25.) He attributes this loss to Defendants Drozdak, who removed his property from his old cell, and Defendants Claudio and Graff, who brought the remaining property to Santos in the disciplinary unit. (*Id.*) However, other than using the term "retaliatory," which is a legal conclusion, Santos does not clearly explain what these Defendants were retaliating against him for or provide factual allegations from which one could infer that the loss of property was either intentional or motivated by retaliation. *See Lawson v. Ferguson*, No. 22-2365, 2023 WL 2770820, at *2 (3d Cir. Apr. 4, 2023) (*per curiam*) ("[T]he fact that Lawson

previously filed grievances and lawsuits against other prison employees does not 'reflect more than a sheer possibility' that the defendants acted in retaliation when they lost or destroyed his legal materials.").

### E. Claims Against Supervisory Defendants and Municipal Entities[16]

Santos has not stated a plausible basis for a claim against Defendants Deputy Warden Tassone, Deputy Warden Roberts, or Deputy Warden Smith, or the entities he sued, *i.e.*, Berks County, the Berks County Jail Prison Board, and PrimeCare Inc.  In a § 1983 action, claims "against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017).  A supervisor may "be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct."  *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015).  "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." *Rode*, 845 F.2d at 1207; *see also Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020).  "Although a court can infer that a defendant had contemporaneous knowledge of

---

[16] To bring claims under § 1983, the plaintiff must show a deprivation committed by a *person* acting under color of state law.  *West*, 487 U.S. at 48 (emphasis added).  Neither the Berks County Jail nor the PrimeCare Mental Health Department at BCJ are considered "persons" subject to liability under § 1983, and thus, are not appropriate defendants in this case.  *See, e.g.*, *Beaver v. Union Cnty. Pennsylvania*, 619 F. App'x 80, 83 (3d Cir. 2015) (*per curiam*) (affirming dismissal of claims against Northumberland County Prison because the prison may not be considered a "person" subject to suit under 42 U.S.C. § 1983 (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989)); *Ruff v. Health Care Adm'r*, 441 F. App'x 843, 845-46 (3d Cir. 2011) (*per curiam*) (citing *Fischer v. Cahill*, 474 F.2d 991, 992 (3d Cir. 1973)); *see also Edwards v. Bucks Cnty. Corr. Facility*, No. 19-4923, 2019 WL 5579486, at *2 (E.D. Pa. Oct. 29, 2019).  Accordingly, the Court will construe claims raised against these Defendants as having been brought against the other municipal entities named by Santos.

wrongful conduct from the circumstances surrounding a case, the knowledge must be actual, not constructive." *Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 222 (3d Cir. 2015). Further, a plaintiff may not plead in the collective by using the word "Defendants" without specifying which specific defendant engaged in the specific conduct alleged by the plaintiff. *See Lawal v. McDonald*, 546 F. App'x 107, 113 (3d Cir. 2014).

A supervisor may also be liable if he or she "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Barkes*, 766 F.3d at 316 (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). This type of liability includes a failure to supervise or train, but a plaintiff asserting such a claim must identify the supervisory or training policy the supervisor failed to employ and "then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory [or training] practice or procedure." *Id.* at 317; *see also Chavarriaga*, 806 F.3d at 227.

Similarly, municipal entities and prison contractors may be liable under § 1983 only if the entity's policies or customs caused the alleged constitutional violation. *See Monell v. Dept. of Social Servs.*, 436 U.S. 658, 694 (1978); *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003) (acknowledging that entity contracted to perform medical services for county jail is state actor for purposes of section 1983). "Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict." *Estate of Roman v. City of Newark*, 914 F.3d 789, 798

40

(3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)).

"Custom, on the other hand, can be proven by showing that a given course of conduct, although

not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to

constitute law." *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). "A

plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries." *Id*.

(citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)).

A plaintiff may also state a basis for municipal liability by "alleging failure-to-

supervise, train, or discipline . . . [and alleging facts showing] that said failure amounts to

deliberate indifference to the constitutional rights of those affected." *Forrest v. Parry*, 930 F.3d

93, 106 (3d Cir. 2019). "This consists of a showing as to whether (1) municipal policymakers

know that employees will confront a particular situation, (2) the situation involves a difficult

choice or a history of employees mishandling, and (3) the wrong choice by an employee will

frequently cause deprivation of constitutional rights." *Id.* "Ordinarily, this requires a plaintiff to

identify a pattern of similar constitutional violations by untrained employees that puts municipal

decisionmakers on notice that a new program is necessary." *Johnson v. City of Phila.*, 975 F.3d

394, 403 (3d Cir. 2020) (internal quotations omitted).

Santos makes generalized and conclusory allegations to support his claims of municipal

and supervisory liability, all of which he essentially lumps together. For instance, he asserts that

Warden Smith, Deputy Warden Smith, Nemeth, Gorell, Levan "failed to train" Berroa, (Compl.

at 6), and more generally that "staff were not trained to follow constitutional limits," (*id.* at 34),

which "result[ed] in a widespread custom and practice of retaliation, harassment, Prea,

unconstitutional conditions, and deliberate indifference to mental health needs," (*id.* at 35).

These are the type of generalized allegations that fall far short of stating a basis for liability

against a supervisor or municipal entity.  *See Saisi v. Murray*, 822 F. App' x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.'  However, a director cannot be held liable 'simply because of his position as the head of the [agency].'") (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)); *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) (affirming dismissal of claims against a municipality because the plaintiff alleged only that he was injured by "the City's policy of ignoring First Amendment right[s]"); *Szerensci v. Shimshock*, No. 20-1296, 2021 WL 4480172, at *7 (W.D. Pa. Sept. 30, 2021) ("Plaintiffs' conclusory allegation, which generally paraphrases the relevant standard, is insufficient to state a claim for § 1983 liability under *Monell*.") (citing cases); *Torres v. Monmouth Cnty. Corr. Inst.*, No. 19-17704, 2021 WL 3773687, at *6 (D.N.J. Aug. 25, 2021) (dismissing failure-to-train claims where allegations were vague and the plaintiff did not provide "facts showing a pattern of prior incidents that would suggest a need for additional training").  Accordingly, Santos has failed to state a claim for supervisory liability or municipal liability.  These claims fail for the additional reason that, with the exception of the claims above related to the conditions of his cell in the disciplinary unit, Santos has not stated a plausible violation of his constitutional rights.  *See Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim.").

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Santos leave to proceed *in forma pauperis* and dismiss all of Santos's federal claims with the exception of his due process claim against Defendants Ramirez and Warden Smith based on conditions of the cell where he served his ten-

day disciplinary sentence.  The Court declines to exercise supplemental jurisdiction over the myriad state claims that Santos brings with the exception of his intentional infliction of emotional distress claim against Ramirez and Warden Smith based on the conditions of Santos's cell, since that is the only state claim that shares a common nucleus of fact with the proceeding federal claim that has not been dismissed.  (Compl. at 37); *De Asencio v. Tyson Foods, Inc.*, 342 F.3d 301, 308 (3d Cir. 2003) (explaining that under 28 U.S.C. § 1367, "a district court may exercise supplemental jurisdiction where state-law claims share a 'common nucleus of operative fact' with the claims that supported the district court's original jurisdiction").  Rather than proceeding to service of the Complaint on the remaining Defendants at this time, Santos will be given an opportunity to file an amended complaint in the event he can cure any of the defects in his claims.[17]  An appropriate Order follows, which provides further guidance to Santos about his options for proceeding.[18]

**BY THE COURT:**

**HON. MIA R. PEREZ**

---

[17] Santos should note that "an amended pleading supersedes the original pleading and renders the original pleading a nullity." *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019).  "Thus, the most recently filed amended complaint becomes the operative pleading." *Id*.  This means Santos's amended complaint, if he files one, must clearly name the defendants he is suing, state the claims he brings against those defendants, and include all factual allegations, jurisdictional allegations, and requests for relief in that pleading. *See, e.g.*, *Hill v. Chester Cnty. Prison*, No. 25-CV-5019, 2025 WL 3214756, at *7 n.7 (E.D. Pa. Nov. 17, 2025) ("[T]he Federal Rules of Civil Procedure do not contemplate piecemeal pleadings or the amalgamation of pleadings, even in the context of a *pro se* litigant.").  Additionally, since pleadings may not be amended or supplemented on a piecemeal basis, the Court has not considered the supplemental exhibits that Santos submitted to the Court.  (ECF No. 7.)

[18] The Court will deny Santos's Motion to Appoint Counsel (ECF No. 5) without prejudice to reassertion after the Court conducts statutory screening of any amended complaint that he may file. *Tabron v. Grace*, 6 F.3d 147, 155 (3d Cir. 1993) (holding that whether the plaintiff's claim has "some merit in fact and law" is a threshold question in appointing counsel).